No. 37,182

A. DeYoung, *Appellant*, v. W. J. Reiling, *Appellee.*

(199 P. 2d 492)

Opinion filed November 13, 1948.

*I. M. Platt,* of Junction City, argued the cause, and *Gerald F. Smith* and *Joseph W. Menzie,* both of Manhattan, were with him on the briefs for the appellant.

*Roy W. Cliborn,* of Junction City, argued the cause, and *James V. Humphrey* and *Arthur S. Humphrey,* both of Junction City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Hoch, J.: This was an action by a real estate broker to recover a commission on the sale of real estate. A demurrer to the plaintiff's evidence was sustained and he appeals. The only question is whether the trial court erred in taking the case away from the jury.

In testing plaintiff's evidence as against the demurrer we observe the repeatedly stated rule that only such evidence as is favorable to him can be considered, and that all reasonable inferences to be drawn therefrom must be indulged in his favor (*Gabel v. Handy,* 165 Kan. 116, 119, 193 P. 2d 239; *Robinson v. Short,* 148 Kan. 134, 79 P. 2d 903).

Plaintiff's testimony, here pertinent, may be summarized as follows: W. J. Reiling, the appellee, owned a farm in Geary county; in November, 1945, he listed it with the appellant DeYoung, who had been a real estate agent for about twenty-two years, for sale at $75,000 cash or $80,000 on a trade, at the regular and customary real estate commission of five percent on the first $5,000 and two and a half percent on the amount above that paid by the purchaser; thereafter DeYoung got in contact with one E. E. Giles and took Giles to the Reiling farm, introduced him to Reiling and showed him the farm; Giles had also listed with DeYoung a farm in Hodgeman county, for sale at $50 an acre; Giles went back to the Reiling ranch upon several different occasions and looked it over; DeYoung told Reiling of the Giles farm in Hodgeman county being for sale at $50 an acre and offered to take him out to see it but was told by Reiling that he could not get away but would go out sometime himself to see it; Giles told DeYoung that there was some question about the title to his Hodgeman county land; in January, 1946, DeYoung received a postal card from Reiling stating "I will not give possession March 1 after Feb. 2. This week the price is $75,000 cash or $80,000 traid"; Reiling was in DeYoung's office two or three times prior to May 16, 1946, at which times the Hodgeman county land was discussed between them; in a conversation with Reiling on May 18, Reiling asked if Giles would put in 640 acres on the deal instead

of 945 acres, and DeYoung called Giles about that and Giles said he would not, and Reiling was so informed; DeYoung told Reiling that the Hodgeman county land was priced at $50 an acre; on May 21, Reiling called DeYoung on the telephone and told him that he had made a deal for the sale of the farm and wasn't going to pay him any commission, and when DeYoung asked him why he was not going to pay the commission, he said that he had gotten the Hodgeman county land for less money than DeYoung had offered it to him; Giles told DeYoung that he and Reiling had reached an agreement but had not signed a contract and DeYoung told Giles he did not want to spoil any deal and to go ahead and sign the contract and he would get his commission; about thirty days after the deal between Giles and Reiling had been closed, DeYoung went to see Reiling about his commission and Reiling complained about his commission being $2,125 instead of $2,000 and said that he had already paid a commission to Cline, another real estate agent; DeYoung had many conversations with Giles after Reiling had listed the farm for sale with him, and the price of $50 per acre for the Hodgeman county land was never changed; DeYoung talked with Reiling on November 30 with reference to a proposition to exchange or trade for the Hodgeman county land, and Reiling said he had been out to see the Hodgeman county land but did not say with whom he went. DeYoung offered to take Reiling out to see the Hodgeman county land that time but Reiling said that he wanted to go by himself.

Giles testified that he owned the Hodgeman county land in 1945, but that the title had not been perfected; that he became acquainted with Reiling when DeYoung took him out to the farm and introduced him in the fall of 1945 at which time DeYoung showed him the Reiling farm with the view of selling it to him, and priced it at $80,000; that he gave the Reiling farm a thorough inspection, looked through buildings and rode over pastures with DeYoung and Reiling, but was not quite satisfied and wanted to look it over further; later he returned and Reiling's son went with him on horseback over the place. He made four or five trips to the Reiling farm and during all of that time discussed its purchase with DeYoung and also talked over with DeYoung the matter of exchanging his Hodgeman county land for it. DeYoung got in contact with him a number of times concerning purchase of the Reiling farm. The title to the Hodgeman county farm was not cleared up until a week or two before the trade was finally consummated. DeYoung called him

by telephone and told him that Reiling was in DeYoung's office at that time but he could not leave his work then, and this was just a few days before the deal was finally closed. Two or three days before he completed the deal with Reiling, Giles was in the office when DeYoung put in a telephone call for Reiling but was told that Reiling had gone to western Kansas. Up to that time he (Giles) had never had any transactions of any sort with Cline about the Reiling land. He had, however, listed his Hodgeman county land with Cline. Cline never took him out to see the Reiling farm. The day before he came to Junction City· where the deal was finally closed, he had a call from someone to come to Junction City, but did not know then whether it was Reiling or Cline. Before he went to Junction City, he tried to get in touch with DeYoung by telephone but got no answer; a telephone call from DeYoung when Reiling was in his office was after the title had been straightened out. In that conversation, no offer was related to him by DeYoung that was acceptable to him and he went down to DeYoung's office the next day and had a talk with him. In that talk, nothing was gone into with reference to the terms of the trade that he and Reiling might work out; nothing about the wheat crop or when possession could be given or about the amount of the mortgage that was on the land, or the taxes. When he went to Junction City in response to the telephone call, he met Reiling and Cline at the hotel. There was discussion about who should receive the wheat crop on the Hodgeman county land and *"the trading back and forth was between Mr. Reiling and me,* but Mr. Cline would come into the conversation when it looked like it was going to slow down. He kept the negotiations rolling along. It took quite a while to thresh out the question of possession."* (Italics supplied.) The differences between them as to the time of possession, as to the taxes—the taxes on the Reiling land being much larger than those on the Giles land—as to future payments and other matters, were worked out between them. It was during these negotiations that an acceptable proposition involving the trade was first offered.

In sustaining a demurrer to the above evidence, the trial court commented as follows:

"It rather strikes me that this was something in the nature of a horse race between these two real estate agents. According to the evidence which is before the court now they each had this land listed with them at about the same time. The Reiling land and the Giles land apparently was listed not only with these two agents but with other agents along about the same time.

"The two agents who are involved in this case apparently worked upon the proposition—I don't know whether it was unknown to each other or not—but it certainly was known by both of the owners of this land, Reiling and Giles, that both of these agents were working upon the proposition right down to the last day. It seems to me that there is no question but what the rule is that that agent who is the procuring cause of the sale is the one that is entitled to the commission. Up until the day which this deal was consummated it seems to me that the evidence shows that these two agents were about equal in so far as their efforts were concerned to consummate this sale. On the day of the sale the agent Cline was the one who finally closed it. What occurred upon that day is the thing, rather slight, it is true, but it is the thing that actually tipped the scales and caused the deal to be consummated. It seems to me that there is an insufficient showing on the part of the plaintiff and that the demurrer should be sustained."

We need not here discuss at length the conditions under which real estate agents or brokers are entitled to a commission. Various aspects of the pertinent law on that subject are treated extensively by the textbook writers—and the cases from which the applicable rules are deduced are legion. It is well, however, to have in mind at the outset some long-established rules. A broker is entitled to a commission if he produces a buyer who is able, willing and ready to purchase upon the proffered terms *or upon terms that are acceptable to the principal.* He must be the "efficient," the "procuring" cause, or as some cases say, the "proximate" cause, of the consummated deal. An owner who has knowledge that a broker with whom he has listed his property has interested a prospective customer with whom he is still conducting negotiations, cannot defeat the broker's right to a commission by the expedient of closing the deal himself or through another broker (12 C. J. S. 215 to 217). The payment of a commission to one broker is not in itself sufficient to avoid liability to another broker provided upon all the facts it appears that the other broker was the procuring cause of the completed transaction (12 C. J. S. 213).

The question of whether a broker has performed services entitling him to a commission is ordinarily one of fact for the jury, if there is conflict of evidence or if there is any substantial evidence to support the essential elements of his cause of action (12 C. J. S. 296, *et seq.*). Each case must be determined upon the particular facts presented. Whether the broker was the procuring cause of a purchase must be determined in the light of all the facts and circumstances leading up to and including any final negotiations between the vendor and purchaser. Among our cases in which this rule has

been followed may be cited: *Ingalls v. Smith,* 93 Kan. 814, 145 Pac. 846; *Thornhill v. Oldham,* 116 Kan. 107, 225 Pac. 1028; *Osburn v. Moore,* 108 Kan. 90, 193 Pac. 892; *Moore v. Gould,* 108 Kan. 99, 193 Pac. 1057; *Neiderlander v. Starr,* 50 Kan. 770, 33 Pac. 592; *Fall v. Tucker,* 113 Kan. 713, 216 Pac. 283; *Wells v. Hazlett,* 125 Kan. 265, 264 Pac. 19; *Soper v. Deal,* 103 Kan. 522, 175 Pac. 396; *Orr v. Meng,* 126 Kan. 723, 271 Pac. 292; *O'Neill v. Foster,* 150 Kan. 593, 95 P. 2d 253; *Brotton v. Dawson,* 137 Kan. 44, 19 P. 2d 467; and *Grimes v. Emery,* 94 Kan. 701, 146 Pac. 1135.

In *Moore v. Gould,* supra, the trial court sustained a demurrer to the plaintiff's evidence upon the ground that there was a variance between the terms agreed upon when the property was listed and those upon which it was sold by another agent. Upon appeal the judgment was reversed, this court holding that the demurrer should have been overruled since the plaintiff had produced a buyer who was ready to buy on terms agreed to by the seller.

In *Soper v. Deal,* supra, the syllabus reads:

"In an action for a real estate agent's commission, where a sale was made through another agent to a purchaser with whom negotiations had been first started by the plaintiff, it is held that the evidence warranted submitting to the jury the question whether the sale was made as the result of a new and independent cause, disconnected with anything the plaintiff had done, operating after the efforts of the plaintiff to make a sale had failed and spent their force, and the purchaser had finally and in good faith decided not to buy on the terms offered him by the plaintiff."

We are unable to adopt the view of the trial court that plaintiff's evidence was insufficient to take the case to the jury. Before considering other aspects of the evidence, we take note of certain comment by the trial court which we think inadvertent, but which inaccurately reflected the record. The court stated that the Reiling land was apparently listed with both agents along about the same time. We find no evidence that Reiling ever listed his farm with Cline. In oral argument here, counsel for the appellee conceded that the only evidence bearing upon that question was from the testimony of Giles. Being questioned as to what happened "several days" before the deal was closed, he was asked "By the way, up to that time had you had any transactions whatever with a Mr. Cline about this Reiling land?" and answered "I had listed the Hodgeman county land with him, yes, and I don't remember, *it might be that he had suggested something about it, but I don't remember.*" (Italics

supplied.) The fact that Giles had listed his Hodgeman county land with Cline and that Cline may have "suggested something" about the Reiling land, certainly does not constitute clear evidence that the Reiling land had been listed for sale with Cline. The trial court commented further to the effect that "both of these agents were working upon the proposition right down to the last day" and that "up until the day which this deal was consummated it seems to me that the evidence shows that these two agents were about equal in so far as their efforts were concerned to consummate this sale." To say the least, that comment did not, in our opinion, give the plaintiff the full benefit of his evidence. The evidence was that beginning in the fall of 1945 and until the deal was closed on May 21, 1946, DeYoung had conducted many negotiations with Giles in an effort to make a trade or a sale of the Reiling land. We find no evidence that prior to the day the deal was closed, Cline had done anything with Giles as far as a sale or trade of the Reiling land was concerned except the testimony of Giles, just referred to, that Cline may have at some time suggested something about the Reiling land to him. And he didn't even remember as to that.

The trial court apparently proceeded upon the theory that both DeYoung and Cline had been equally active in selling the Reiling land to Giles and that since the deal was finally closed between Reiling and Giles with Cline present and participating in the final negotiations, it follows as a matter of law that DeYoung was not entitled to a commission. We do not agree that the evidence requires the conclusion that both agents had been equally active as to the Reiling land. Even the question of whether Cline was entitled to full credit for getting the parties to iron out matters incident to closing the deal and agree fully on terms was, we think, a question of fact for the jury under the evidence. With reference to what took place on the day the deal was closed at Junction City, Giles testified: "We finally agreed on a price after a lot of other parts of the deal had been agreed upon" and "Mr. Cline was there sitting in the conversation. The *trading back and forth was between Mr. Reiling and me*, but Mr. Cline would come into the conversation when it looked like it was going to slow down. *He kept the negotiations rolling along.*" (Italics supplied.) In any event, the circumstances incident to final closing of the deal are not, under abundant authority, the only thing to be considered.

It is unnecessary to review in full plaintiff's evidence as heretofore set out. The Reiling land had been listed with DeYoung for at least six or seven months. DeYoung took Giles to the Reiling farm, introduced him to Reiling and showed him the farm. Giles went back and looked over the Reiling farm four or five times and during all that time he discussed with DeYoung the purchase of the Reiling farm or a trade. DeYoung told Reiling about the Giles farm in Hodgeman county and offered to take him out to see it but Reiling could not go at that time and said he would go out some time and see it himself. Reiling was in DeYoung's office a number of times at which the Giles farm was discussed. The title to the Giles farm was not cleared until a short time before the trade was made. Giles did not testify as to any transaction with Cline involving the Reiling land other than that above noted. Cline never showed him the Reiling land. Other evidence, heretofore set out, need not be repeated.

We are not here saying that the appellee may not place a construction upon the plaintiff's evidence entirely different from that urged by appellant. Of course we do not speculate as to what Reiling's testimony might be. We are in no way weighing the evidence. We are only saying that the evidence entitled the plaintiff to go to the jury upon the question of whether he had produced a buyer who was ready, willing and able to purchase or trade for the Reiling land upon terms that were acceptable to Reiling, and whether he was in fact the procuring cause leading up to a closing of the deal.

The judgment is reversed with directions to overrule the demurrer.